IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION


UNITED STATES OF AMERICA    )
    )    No. 1-07-0058
v.    )
    )
$275,000 IN UNITED STATES    )
CURRENCY    )


To:    Honorable Todd J. Campbell, Chief Judge


REPORT AND RECOMMENDATION


On July 16, 2007, the United States (hereinafter "the government") filed a verified complaint in rem, seeking the forfeiture of $275,000.00, seized from Ali Konate during a traffic stop in Hickman County, Tennessee on January 11, 2007. The claimant, Ali Konate ("hereinafter "Mr. Konate" or "claimant"), filed a claim and an answer (Docket Entry Nos. 5 and 7-8).

By order entered June 9, 2008 (Docket Entry No. 12), this case was referred to the Magistrate Judge for entry of a scheduling order. After a status conference on August 21, 2008, a scheduling order was entered on August 22, 2008 (Docket Entry No. 15). Pursuant to that scheduling order, Mr. Konate filed a motion to suppress (Docket Entry No. 16). By order entered August 29, 2008 (Docket Entry No. 18), the motion to suppress was referred to the Magistrate Judge for a Report and Recommendation. Thereafter, the government filed a response and Mr. Konate filed a reply. See Docket Entry Nos. 16-17, and 19-21.

An evidentiary hearing was held on February 24 and 25, 2009, at which time the Court viewed and listened to the video tape and compact discs, see Government's Exhibits 1, and 9-10, of the traffic stop at issue on January 11, 2007,[1] the government called as witnesses Rhett Campbell,

---

[1] The video counter begins at number 151. See Government's Exhibit 1. Although the claimant suggests that the first few minutes may have been edited out of the video, see Docket Entry No. 17 at n.1, Agent Campbell testified that the video prior to number 151 was of a different traffic stop.

Tim Hawn, and Chris Utley, Task Force Officers of the 21st Judicial District Drug Task Force, and Ron Riddle, Special Agent with the Drug Enforcement Administration. Counsel for Mr. Konate recalled Officer Campbell and called Ibrahima Diop, the driver and owner of the van that was the subject of the traffic stop.[2] The parties also introduced numerous exhibits.

Mr. Konate seeks to suppress the fruits of the search of the van and the locked suitcase that was in the van, the testimony of the law enforcement agents about their observations while engaged in the search, any statements made by Mr. Konate during the search, and any evidence resulting from investigatory leads obtained in the search.

### A. FINDINGS OF FACT

Testimony and Proof Presented at Evidentiary Hearing

Ibrahima Diop was driving a 2004 Chevrolet van in Hickman County, Tennessee, travelling west on I-40, when he was pulled over by Task Force Officer Campbell at approximately 11:53 a.m. on January 11, 2007. The van was registered in Mr. Diop's name. The claimant, Ali Konate, was a passenger in the van when it was pulled over, although Mr. Konate had previously been driving the van. Mr. Diop and Mr. Konate had driven from New York, leaving the night before. The van had a New York license tag.

Prior to being pulled over, Mr. Diop was travelling in the left hand lane. Officer Campbell began travelling behind him and Mr. Diop turned on his turn signal and moved into the right hand lane in front of a tractor trailer. Once the van was stopped, Officer Campbell approached the passenger side of the van. Officer Campbell testified that, at that point, he smelled "raw marijuana."[3]

---

[2] Mr. Diop testified that Ali Konate, the claimant, could not appear to testify because he is unable to get a visa to travel to the United States because of the incident at issue in this case.

[3] Officer Campbell explained that the marijuana odor was not "burnt marijuana," but rather marijuana that had not been smoked or burned. He also testified that, after initially smelling raw marijuana, one becomes immune to the smell. He related that he had previously smelled and identified marijuana on "many" occasions.

2

Officer Campbell has been a member of the Drug Task Force since October or November of 2006, and had been with the Tennessee Highway Patrol for five years prior thereto, as well as less than one year as a city police officer. He testified that he had received training in drug identification and had been involved in drug seizures.

Mr. Diop resides in New York City and has been a United States citizen since 2005. He was originally from Bali, Africa, and has been in the United States for almost 20 years.

After obtaining Mr. Diop's driver's license and determining the correct pronunciation of his surname, Officer Campbell asked Mr. Diop to get out of the car and explained to him that he had been stopped because he changed lanes without providing enough room between him and the tractor trailer travelling in the right hand lane behind him. Mr. Diop explained that he changed lanes to allow Officer Campbell to pass him. Officer Campbell testified that Mr. Diop acknowledged that he had not left sufficient room between him and the tractor trailer when he changed lanes. Officer Campbell testified that Mr. Diop made an abrupt lane change in violation of Tenn. Code Ann. § 55-8-117. Although he did not so inform Mr. Diop, Officer Campbell testified that the tractor trailer had to "stop abruptly" and "almost collided with" the van.

After Officer Campbell explained that Mr. Diop had been pulled over because he had changed lanes abruptly, Mr. Diop responded "I was doing that." However, Mr. Diop testified that he "felt like" he had enough room when he changed lanes and believed that he had two car lengths between him and the 18 wheeler. Whether Mr. Diop was actually agreeing that he had changed lanes without leaving sufficient space or whether he was reiterating that he changed lanes to allow Officer Campbell to pass him is not clear to the Court.

According to Officer Campbell, Mr. Diop had no difficulties understanding him and the only impediment to their conversations was the noise of the ongoing traffic on the interstate. The Court finds that the noise of ongoing traffic was indeed an impediment, but cannot discount entirely some

---

The Court notes that, although the government described the van as "reeking of marijuana," see Docket Entry No. 19, at 11, and 14, Officer Campbell never used the word "reek." Officer Currie used the word "reek" in reference to the brown substance found in wax paper, addressed infra.

3

language barrier. From his own testimony, the Court finds that Mr. Diop can speak, read, and understand English. However, his English is not perfect and it was clear to the Court that he has some deficits in comprehension. For instance, when cross-examined about details of the January 2007, car trip, it appeared to the Court that he was not always clear about whether the inquiries related to that specific trip or to other trips he had taken.

After asking a few preliminary questions of Mr. Diop, Officer Campbell returned to the passenger side of the van and asked Mr. Konate for the car registration and insurance. Officer Campbell testified that, while Mr. Konate was trying to find the documents, his hands were shaking. Before the registration and insurance documents were located, Officer Campbell asked Mr. Diop about their travel plans and he responded that they were going to Memphis and on to Arizona. Ultimately, Mr. Konate was unable to locate those documents, but, after a few minutes with Mr. Diop's assistance, the documents were located. At approximately 12:02 p.m., Officer Campbell called the Blue Lighting Operation Center ("BLOC") to check the registration, driver's licenses, car tag, and identifications. Almost simultaneously with the beginning of Officer Campbell's conversation with BLOC, Officer Corey Currie arrived in a separate car. While Officer Campbell was on the phone, he told Officer Currie to go to the van and "see what you smell."

Mr. Konate is not a United States citizen and is a citizen of Burkina Faso, West Africa. He had been in the United States for two (2) weeks at the time of the stop, although he had been in the United States on at least one prior occasion.

Mr. Diop testified that he had known Mr. Konate for 8-9 years, that he buys African art from Mr. Konate and that he travels with Mr. Konate when he is in the United States. Mr. Diop related that Mr. Konate had bought a shipment of African art two weeks before they began their trip on January 10, 2007, when they were travelling from New York to Memphis, then to Arkansas, Kansas, and Texas to look at bulldozers that Mr. Konate intended to sell in Africa, and then to a Gem and Mineral Show in Tucson, Arizona.

4

At 12:08, Officer Campbell asked Mr. Diop if there were anything illegal in the van, specifically guns or drugs. Mr. Diop quickly responded "no" to the questions about drugs and guns. When Officer Campbell asked Mr. Diop if he had any large amounts of money, he did not respond immediately and asked that Officer Campbell repeat the question. Upon repeating the question, Mr. Diop responded "no." Officer Campbell testified that, when he asked Mr. Diop questions about money, Mr. Diop paused, his body language changed and "stiffened up," he moved his hands more than he had, and he did not respond as he had to the previous questions. Officer Campbell told Officer Currie that Mr. Diop "seemed worried," and "wanted to fall apart" when he asked him questions about money in the van.

Thereafter, Officer Campbell asked Mr. Diop if he could search the van. Specifically, Officer Campbell asked, "No problem with us searching the van?" Mr. Diop appeared to verbally consent by responding "No problem," although he testified that he did not realize that he could refuse. Officer Campbell then gave Mr. Diop a written consent-to-search form and, after confirming that Mr. Diop could read English, gave him "a minute" to read the form and explained the contents to him. Before signing the form, Officer Campbell asked Mr. Diop if he understood the form and he responded "Not really." Officer Campbell then explained that the form provided that Officer Campbell had not threatened or coerced him and that he was "letting [Officer Campbell] do this of [his] own free will." Although Mr. Diop testified that he did not understand the form, from the video, it appears that Mr. Diop seemed to understand what Officer Campbell said and signed the consent form at 12:15 p.m.[4] Officer Campbell never orally told Mr. Diop that he had a right to refuse to sign the form or a right to refuse to consent to a search. However, the consent form itself clearly provided that he had the right to refuse to consent and to refuse to sign the form.

The consent form was short and written in understandable language. It provided as follows:

> I, Ibrahima Diop hereby grant my consent to Rhett Campbell, Corey Currie, Officers of the 21st Judicial District Drug Task Force to search the following described vehicle below, including luggage, containers and contents of all. This includes the

---

[4] The form is dated "1/11/06," which is clearly a mistake since the date was January 11, 2007.

removal of any suspicious paneling or other vehicle components and the least intrusive access to any constructed compartment used for the purposes of concealing contraband.

[Vehicle was described.]

I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form. I further state that no promises, threats, force, physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form.

Government's Exhibit 4.

There was no proof that Mr. Diop could not read or understand English or was incapable of reading or understanding the consent form.

After signing the consent form, Officer Campbell asked Mr. Diop if he could "pat him down." Mr. Diop agreed, although he testified that he did not realize he had the right to refuse. Officer Campbell then again asked Mr. Diop if there were any guns or drugs in the van and Mr. Diop responded "No." When asked how much money was in the van, Mr. Diop responded that he did not know and that he did not have any money in the van.

Officer Campbell then asked Mr. Konate to "hop out" of the van and Mr. Konate agreed to Officer Campbell "patting him down."

At approximately 12:16 p.m., Officer Campbell gave Mr. Diop and Mr. Konate the option of standing outside of the van or sitting in his police car. They chose to sit in the police car. They were not handcuffed and Officer Campbell "cracked" the back window. Officer Campbell conceded that the car was locked from the outside and Mr. Diop and Mr. Konate would not have been able to get out of the car unless they reached through the "cracked" window and unlocked the car from the outside. Mr. Diop testified that he did not feel free to leave.

At approximately 12:17 p.m., Officer Campbell began the search of the van. Initially, Officer Campbell opened the back of the van, and testified that, when "things started falling out," he obtained the assistance of Officer Currie. Officer Campbell testified that some of the pieces were already broken, were dusty, and had been packed with "not a whole lot of care." After viewing the video, the Court finds that the African art was not packed in a fashion in which one would store

6

valuable pieces.  Rather, it appeared that the pieces were in a haphazard and disorganized manner.[5]
Officer Campbell removed a few pieces from the van and placed them on the side of the road.[6]  It
appeared from the video that Officer Currie removed more items from the side of the car.  During
this search, Officer Campbell commented to Officer Currie that Mr. Diop was worried when asked
about money in the van and that his hands were shaking when he signed the consent-to-search form.

Without having removed all of the items from the side and back of the van, Officer Campbell
and Officer Currie began searching the front of the van.  Their search was interrupted by a call from
a man named Charlie from BLOC at approximately 12:21 p.m.  At the completion of the
approximately two minute call, Officer Campbell concluded, "All right; I appreciate it."  It was not
clear from Officer Campbell's responses what Charlie had said.  However, Officer Campbell testified
that he was advised that both driver's licenses were "clear."

When Officer Campbell continued the search, he commented to Officer Currie that
"something [was] just not right," and that, when he initially approached the car, he smelled what he
thought was a "load of marijuana."  Officer Campbell again told Officer Currie that, when he
initially asked Mr. Diop about any money in the car, Mr. Diop stared at him.

At approximately 12:24 p.m., after approximately seven minutes into the search with the side
door and back doors of the van open, Officer Campbell commented that he could no longer smell
the marijuana.  However, Officer Campbell found a substance wrapped in wax paper that smelled
"awful."  He testified that he was not certain where it was located in the van, but remembers that it
was on the console in the front of the van and not in the suitcase that was searched.  The video
recording shows that Officer Campbell commented, "I think that's what it is; I can smell it now."

_____

[5]  Mr. Diop testified that the heavier art was placed in the bottom of the back of the van, with the
lighter objects on the top, a method that is consistent with that used by African traders.  He also
testified that he stores the art on a permanent basis in his van.

[6]  Mr. Diop testified that several of the pieces were broken during the search.  See, e.g.,
Claimant's Exhibits 3 and 8.  Although the video did not include any later search, there was no
indication that the officers conducting the search at the side of the highway treated the property in
any way that would result in breaking any pieces.

Officer Currie commented that it "reek[ed]" and smelled like "rotten meat." However, Officer Campbell testified that the odor of the brown powder was "not close to the smell of marijuana." A suitcase[7] was also located in plain view in the front of the van between the two front seats. One side of the case opened but the other did not, so Officer Campbell went to the police car and asked for the combination number. Mr. Konate responded, "Zero, zero, zero." Once Officer Currie opened the suitcase at approximately 12:26 p.m., he found clothes and large sums of cash.[8] Officer Campbell testified that the money was in thick stacks of bills banded together by rubber bands. He also testified that the packaging of the money was different from money obtained from a bank, with would be neat with bandings and an indication of how much money was in each pile.

As a result, at approximately 12:31 p.m., Officer Campbell decided to Mirandize Mr. Diop and Mr. Konate. At 12:35 p.m., Officer Campbell told Mr. Diop he was not under arrest "at this time," but read him his Miranda rights. Mr. Diop orally agreed to answer questions. Upon questioning, Mr. Diop reiterated that there were no guns or illegal drugs in the car and no large of amount of money "that [he knew] of," and that he had about $110.00. Mr. Diop suggested that Officer Campbell ask Mr. Konate if there were more money in the van. Officer Campbell testified that, each time he asked Mr. Diop about money, the more worried Mr. Diop became. Mr. Diop signed the Waiver of Rights form at 12:43 p.m.,[9] in which he indicated that he was willing to answer questions, and placed checks to the right of his right to remain silent, the notification that anything he says can be used against him in court, his right to talk to a lawyer before any questions are asked

---

[7] The "suitcase" at issue was alternatively referred to as a "suitcase" and a "briefcase," but is referred to herein as a "suitcase."

[8] The claimant notes that the cash was located in the suitcase before the drug detection dogs arrived on the scene, and suggests that Agent Riddle's affidavit in support of the complaint is incorrect. See Docket Entry No. 2, at 3. Agent Riddle did not, however, explicitly attest that the money was found after the dogs detected the odor of drugs, but the Court agrees with the claimant that the affidavit leaves that impression.

[9] The time reflected on the signed documents is slightly different from the time on the counter of the tape recording. Officer Campbell testified that he never synchronized his watch with the time on the tape recording.

8

and to have a lawyer present, and his right to have a lawyer appointed to represent him.  See Government's Exhibit 7.

Mr. Konate signed the same Miranda form at 12:45 p.m., after Officer Campbell advised him he was not under arrest and not going to go to jail and after he verbally explained the contents of the form.  See Government's Exhibit 6.  Upon questioning, Mr. Konate acknowledged that he had money in the van and wrote down the figure of $285,000.00.  Upon questioning by Officer Campbell, Mr. Konate agreed that he buys and sells African art, but that he also sells cars, and had bought cars in the United States to sell in Africa.  He advised that about 30 of the pieces of art in the van belonged to him, and estimated the value of a few of the individual pieces, concluding that the total value of the artwork in the van was about $20,000.00.[10]  Mr. Konate identified the specific models of five cars that he had previously bought in the United States and sold in Africa.[11]  Mr. Konate told Officer Campbell that the money in the van did not belong to him but instead belonged to a company that had provided it to him to buy a Caterpillar bulldozer to ship back to Africa. Officer Campbell testified that Mr. Konate said that he had paperwork related to the money and the bulldozer, but the only paperwork provided was a business card for a company named Konyate & Freres located in New York City, with a description of "General Merchandise."

At approximately 12:53, Officer Campbell called agent-in-charge Tim Hawn, advising that he had "hit a money lick," and seeking guidance.  In that conversation, Officer Campbell also

---

[10]  It is not clear to the Court whether Mr. Konate intended to value the entire vanload of African art at $20,000.00 or just the approximately 30 pieces that he represented were his.

[11]  The language barrier between Officer Campbell and Mr. Konate appeared more pronounced than the language barrier between Officer Campbell and Mr. Diop.  Although, when Mr. Diop referred to "Arkansas," Office Campbell misunderstood him, thinking he had referred to his "cousins," when, for example, Mr. Konate referred to a "Mercedes Benz," Officer Campbell understood him to say "Methodist Bank."  In addition, when Officer Campbell asked Mr. Konate if he had any guns, he responded that he had an old gun.  However, it appears that he was describing a gun that he owned, not a gun that was in the van.  On the other hand, Mr. Konate was able to describe with precision, albeit not in fluent English, the cars that he had previously purchased in this country.

9

relayed that "the driver," i.e., Mr. Diop seemed "really worried," "worried bad," "scared to death," and that Mr. Diop "wanted to fall apart" when questioned about money in the van.

In the meantime, Officer Campbell put the suitcase on the hood of his car and opened it for viewing by the camera installed in his car. Upon inquiry from Officer Campbell, Mr. Konate explained that the substance Officer Campbell described as "brown powder" was homemade medicine made by Mr. Konate's father.

At approximately 1:00 p.m., Officer Campbell called BLOC again, and was advised that there was no criminal history for either Mr. Diop or Mr. Konate. Thereafter, Officer Campbell removed the suitcase from the hood of his car, and instructed Officer Currie to close the van doors.

Officers Hawn and Utley arrived at approximately 1:10 p.m., with their dogs Barco and Heidi, respectively. Both Officer Hawn and Officer Utley have been trained to use drug detection dogs and have been certified as drug detection handlers. Likewise, Barco and Heidi have been trained and certified as drug detection dogs. See Government's Exhibits 13 and 14.[12] Officer Campbell had not relayed to Officer Hawn, prior to or after his arrival, that Mr. Konate had advised that the brown substance in waxed paper that emitted a strong odor was an herbal medicinal remedy. Mr. Diop testified that Mr. Konate was suffering from stomach pain and that the strong smell came from Shea Butter used in the home remedy. Although Officer Hawn testified that he would have liked to have known about any overwhelming odors, he also explained that the drug detection dogs are trained to differentiate the odor of drugs from other odors. Mr. Diop also testified that the pieces of art also have their own smell because most of them were originally used in kitchens in Africa,

--------

[12] The claimant suggests that the use of drug sniffing dogs is unreliable, citing United States v. $5000.00 in U.S. Currency, 40 F.3d 846, 849 (6th Cir. 1994), since there is frequently drug residue on currency. The claimant also cites an official of the Justice Department who has expressed skepticism about solely relying upon canine drug alerts to currency in a forfeiture action. See Docket Entry No. 17, at 5 n.9. While there may be reason for that skepticism, the issue in the claimant's motion is not whether the currency should be forfeited, but rather whether the currency and the fruits of the search should be suppressed.

10

where cooking was done with wood, so the art keeps a smokey odor. In addition, Mr. Diop testified the patina used to shine wood to make it darker has its own distinctive smell.

Upon his arrival, Officer Hawn led his dog Barco around the van and thereafter Officer Utley ran his dog Heidi around the van. After Officer Hawn lost his footing on the gravel embankment,[13] and at approximately 1:15 p.m., he put Barco in the van and he alerted to the suitcase by scratching it. Officer Hawn did not smell an odor of marijuana or anything else of significance when he opened the van door. Heidi alerted to the front passenger door by scratching over 10 seconds, and, when inside the van, alerted to the suitcase, again by scratching it.[14] Officer Utley testified that there was a "noticeable odor of marijuana" when he opened the driver's side door of the van. The suitcase was opened and Officer Hawn testified that there was a "strong odor of marijuana emanating" from the suitcase. Officer Campbell testified that the money seized was later counted and, as reflected in the Asset Forfeiture Talley Sheet, was a total of $275,000.00. See Government's Exhibit 9. See also Officer Hawn's Search Find Report. See Claimant's Exhibit 5.

At that point, Officer Hawn called the DEA, and at approximately 2:30 p.m., Mr. Diop drove the van to a Citgo station at the next exit at Bucksnort. Mr. Konate and Mr. Diop remained in a patrol car while at the Citgo station and were not provided any food or drink, but Officer Campbell testified that they were "walking around" part of the time.[15]

---

[13] Officer Hawn testified that Barco had stopped at the passenger side door, but when Officer Hawn slipped on the incline, he jerked Barco away and thereby diverted Barco from his examination. The Court finds, however, that it is difficult to determine from the video that Barco actually alerted on the passenger side of the van. The Court does not find that the sequence of events did not occur as Officer Hawn testified--simply that the video does not absolutely confirm them.

[14] Officer Utley testified that he had incorrectly listed the "hit location" as the "exterior driver door" on his Search Find Report. See Government's Exhibit 15.

[15] Mr. Diop testified that he was permitted to relieve himself by a fence on the gas station property, and that he and Mr. Konate were taken out of the car to talk to law enforcement authorities, including representatives from Homeland Security and U.S. Customs, and then put back in the car.

Agent Riddle arrived at the Citgo station and, after talking to Mr. Konate and Mr. Diop,[16] determined that there was sufficient basis to seize the money for further investigation. In addition to information provided by the Task Force Officers about a marijuana odor, the "drug dog hits," and the amount of money found, which he described as consistent with "narcotics proceeds," Agent Riddle also referred to Mr. Konate's explanation that the funds had come from a bank that was not really a bank and that Mr. Konate could only produce the Konyate & Freres business card, see Government's Exhibit 8, as verification for the "bank." In addition, Agent Riddle testified that, upon his questioning about why Mr. Konate had not established a business banking account, Mr. Konate explained that he could not do so because he had only been in the country for two weeks. However, Agent Riddle testified that there were documents in the van reflecting that Mr. Konate had two personal bank accounts, although Agent Riddle did not testify that he asked Mr. Konate about personal bank accounts. Although a receipt for $100,000.00, notating a "balance" of $78,218.00, dated January 4, 2007, was located in the van, see Government's Exhibit 8, no documents were located in the van that verified Mr. Konate's receipt of $275,000.00. Agent Riddle also testified that a Currency Transaction Report ("CTR"), dated February 25, 2004, reflected that Mr. Konate had received $25,000.00, and a Report of Cash Payments, dated May 2, 2007, reflected a cash payment to a New Jersey car dealership for $16,600.00, on July 10, 2006, for the purchase of a 2004 Nissan, and that those documents included different New York City addresses for Mr. Konate. See Government's Exhibit 16.[17]

Mr. Diop testified that, when Mr. Konate comes to this country, he stays temporarily with friends in New York City, in both the Bronx and Brooklyn, since he does not have a residence in

---

[16] Agent Riddle testified that neither Mr. Konate nor Mr. Diop expressed any reluctance to speak to Agent Riddle nor did they address any issues about how they had been treated. Instead, according to Agent Riddle, their statements appeared voluntary.

[17] Since the Report of Cash Payments Over $10,000.00 (IRS Form 8300), includes a signature date of May 2, 2007, after the incident at issue, it is not clear whether any of the documents comprising Government's Exhibit 16 were located in the van or whether Agent Riddle later obtained those documents.

the United States. To the extent that the government relies on Mr. Konate's use of different addresses at different times, the Court finds Mr. Diop's explanation reasonable.

At the Citgo station, there was discussion about whether to seize Mr. Diop's van, but Officer Campbell testified that ultimately Officer Hawn determined not to seize the van. Officer Campbell was not able to testify about how long Mr. Konate and Mr. Diop remained at the Citgo station. However, Officer Hawn testified that, although he did not know how long they remained there, it was "dark" before they left. Officer Hawn's testimony is consistent with Mr. Diop's testimony that they remained at the Citgo station until 5:00 or 6:00 p.m.

Officer Campbell testified that, during the stop or at the Citgo gas station, he wrote Mr. Diop a ticket for improper passing but forgot to give it to him. Officer Hawn mailed the ticket on January 17, 2007, along with a letter to Mr. Diop dated January 11, 2007. See Claimant's Exhibit 2.[18] The records of Hickman County reflect that Mr. Diop was convicted of the offense after having paid $150.00 as listed on the ticket. See Government's Exhibit 2.

No marijuana or other narcotics were found in the van. However, Officer Campbell and Agent Riddle testified that a later ION[19] scan revealed cocaine residue on the cash.

## B. DISCUSSION

1. Legality of Initial Stop

Although there remains some disagreement in the Sixth Circuit about whether law enforcement officers must have probable cause to believe that a traffic violation has occurred or whether reasonable suspicion is sufficient, see United States v. Simpson, 520 F.3d 531, 540 (6th Cir. 2008) (Court has "grave doubts" about the correctness of the requirement of probable cause for a traffic stop); United States v. Sanford, 476 F.3d 391, 395 (6th Cir. 2007); Gaddis v. Redford

---

[18] Officer Hawn could not explain why the letter was not mailed until January 17, 2007.

[19] The claimant explains that ION refers to a mobility spectrometry scan. See Docket Entry No. 17, at 5.

13

Township, 364 F.3d 763, 768-771 (6th Cir. 2004) (reasonable suspicion standard for traffic stop involving suspected violation of criminal offense), the parties appear to agree that probable cause is required for a traffic stop.  See Docket Entry No. 17, at 7; Docket Entry No. 19, at 2;[20] United States v. Freeman, 209 F.3d 464, 466 (6th Cir. 2000).

Although Officer Campbell was a member of the 21st Judicial District Drug Task Force, and he testified that, as such, his duties did not involve simply stopping vehicles and issuing traffic tickets, whether or not the traffic stop was pretextual is irrelevant if there was probable cause to believe that a traffic violation had occurred.  Whren v. United States, 806 U.S. 810, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); United States v. Sanford, supra; United States v. Palomino, 100 F.3d 446, 448-49 (6th Cir. 1996).

To determine whether probable cause existed to stop the van the Court must consider whether the facts and circumstances within Officer Campbell's knowledge at the time would warrant a reasonable person to believe that an offense has occurred, i.e., that Mr. Diop violated Tenn. Code Ann. § 55-8-117.  See United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993) (en banc).  Tenn. Code Ann. § 55-8-117(1) provides that "[t]he driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left thereof at a safe distance and shall not again drive to the right side of the roadway until safely clear of the overtaken vehicle."

The Court finds that Officer Campbell's testimony that he observed Mr. Diop change lanes without leaving sufficient space between his vehicle and the tractor trailer travelling in the lane into which he moved to be credible.  Mr. Diop testified that he moved into the right hand lane to allow Officer Campbell to pass him.  The Court also credits that testimony.  However, his motivation, albeit understandable, does not negate Officer Campbell's testimony that, when Mr. Diop moved into the right hand lane, he did not leave sufficient room between his van and the tractor trailer behind

---

[20] Although the government referred to probable cause at the beginning of its memorandum, see Docket Entry No 19, at 2, the government also argued that Officer Campbell had "reasonable suspicion" to believe that a traffic violation had occurred, see id. at 9, but cited cases holding that probable cause is required.

14

him, causing the driver of the tractor trailer to moderate his speed. In fact, Mr. Diop's credible testimony that he moved into the right hand lane to allow Officer Campbell to pass him actually tends to corroborate Officer Campbell's testimony since Mr. Diop was clearly motivated to move out of the way so that Officer Campbell could proceed.

The claimant suggests that, because Officer Campbell did not video tape the lane change and the driver of the tractor trailer did not testify, the government has failed to establish probable cause. The Court disagrees since the Court can find that there was probable cause based solely on the credible testimony of Officer Campbell, unless circumstances surrounding the stop would suggest otherwise. For instance, in United States v. Freeman, 209 F.3d 464, 466-69 (6th Cir. 2000), the Court found that there was no probable cause to believe that a driver had violated a Tennessee statute requiring vehicles to say within one lane when a top-heavy, large mobile home had partially weaved into an emergency lane for a few feet, the weather conditions were windy, and the vehicle was rounding a curve.

The Court is not, however, persuaded that, after he was stopped, that Mr. Diop agreed that he had made the lane change without leaving sufficient space. From listening to the video, it is not clear to the Court what Mr. Diop meant when he said, "I was doing that." However, whether or not Mr. Diop acknowledged that he had violated the law is not determinative.

After hearing the testimony of Officer Campbell and Mr. Diop, the Court finds that Officer Campbell had probable cause to stop Mr. Diop's van for violation of Tenn. Code Ann. § 55-8-117.


2.    Duration and Scope of the Stop[21]

Officer Campbell pulled the van over at approximately 11:53 a.m. He testified that, upon approaching the passenger side of the van, he smelled raw marijuana. Although no marijuana was ever found in the van, Officer Campbell's articulated belief that there was a smell of marijuana was

_____

[21]  Although the claimant frames his contentions that both the scope and duration of the stop were unreasonable, the issues involving the scope and duration are basically intertwined with each other.

clearly not an after-the-fact justification. He repeated his assertion that he smelled an odor of marijuana no less than nine times during the stop. See Docket Entry No. 17, at 4. The drug dogs later also alerted to the odor of drugs, Officer Utley testified that, when he opened the driver's side of the van, he had also smelled marijuana, and Officer Hawn testified that there was a strong odor emanating from the suitcase in the van. Although the marijuana odors about which the other officers testified they later smelled are not relevant to prolonging the stop initially, they do tend to confirm that Officer Campbell had a reasonable belief--albeit ultimately wrong--that he had smelled marijuana.

After explaining to Mr. Diop why he had been pulled over and a few minutes were devoted to locating the car registration and insurance documents and inquiries about Mr. Diop's travel plans, Officer Campbell initiated an inquiry at approximately 12:02 p.m. to check the vehicle registration, drivers' licenses and identifications. That period of approximately 10 minutes is not unreasonable. At 12:08 p.m., Officer Campbell asked Mr. Diop if there were anything illegal in the van. Although Mr. Diop responded "no" quickly to questions about illegal drugs or guns, when asked if there were large amounts of money in the van, Mr. Diop asked Officer Campbell to repeat the question. According to Officer Campbell, Mr. Diop "stiffened up," and "seemed worried."

The Court agrees with the claimant that nervousness by itself is not sufficient to create reasonable suspicion and agrees that most people may display some signs of nervousness when pulled over by law enforcement. However, the Court finds that Mr. Diop did indeed react somewhat differently to the question about whether there was money in the van. The noise from the traffic at the moment the question was asked was not sufficient to justify any inability to hear clearly. However, from the tape recording, it was difficult to determine that Mr. Diop appeared "scared to death." On the other hand, Mr. Diop himself testified that he knew that there was money in the van, admitted that he had lied to Officer Campbell, and acknowledged that he was, in fact, scared.[22]

---

[22] Mr. Diop also testified that Mr. Konate had gone to the "bank" on four occasions before they had left New York. On three of those occasions, Mr. Diop had accompanied Mr. Konate, and on all of the occasions Mr. Konate had received cash, including one time for more than $90,000.00.

16

Thus, Mr. Diop himself corroborated Officer Campbell's testimony that Mr. Diop reacted differently to the question about money in the van.

After reading the consent form and after Officer Campbell's explanation Mr. Diop signed the consent-to-search form at approximately 12:15 p.m. The time between the initial stop shortly before noon and 12:15 p.m. was not unreasonable, given that BLOC had not yet responded to Officer Campbell's request for confirmation of documentation, Officer Campbell's reasonable belief that he smelled marijuana, and Mr. Diop's reaction to questions about money. The Court further credits the testimony of Officer Campbell that he had concerns about Mr. Diop's rendition of his travel plans and purpose for the trip. However, Mr. Diop's responses to Officer Campbell's questions would not, in and of themselves, provide sufficient basis to prolong the stop inasmuch as it appears to the Court that the language and cultural barriers may have affected both Mr. Diop's responses and his understanding of Officer Campbell's questions. The fact that Mr. Diop's explanation of his travel plans did not comport with Officer Campbell's expectations would not, in and of itself, justify prolonging the stop.

A traffic stop cannot be prolonged once the initial purpose of the traffic stop is completed unless something occurs that generates "the necessary reasonable suspicion to justify a further detention." United States v. Mesa, 62 F.3d 159, 162 (6th Cir. 1995).[23] The Court finds that Officer Campbell's reasonable belief that he had smelled marijuana and Mr. Diop's reaction to questioning about money were sufficient to provide that "necessary reasonable suspicion" to prolong the stop. In addition, the final confirmation that there were no outstanding warrants and that the occupants of the van had valid driver's licenses was not received, according to Officer Campbell, until approximately 1:00 p.m., and clearly no earlier than 12:23 p.m.

---

[23] The applicability of Mesa as mandating a bright line rule has been called into question after Ohio v. Robinette, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). See United States v. Burton, 334, F.3d 514, 517-18 (6th Cir. 2003). However, the Court finds that the continued stop and questioning in this case meets the Mesa standard.

17

At approximately 12:17 p.m., Officer Campbell began the search of the van. At approximately 12:31 p.m., the suitcase was opened, revealing a large sum of cash. At that point, Officer Campbell gave Mr. Diop and Mr. Konate Miranda warnings, although he advised them that they were not under arrest. Mr. Diop and Mr. Konate signed Miranda forms at 12:43 p.m. and 12:45 p.m., respectively. Thereafter, Mr. Konate acknowledged that he had money in the van and wrote down a figure of $285,000.00.[24] The Court cannot make any adverse inference from the fact that Mr. Konate had to write down the amount of cash.[25] Mr. Konate is not an American citizen and it is reasonable that he would feel more comfortable writing down the amount than verbalizing it.

Although perhaps not as significant to the claimant as the duration of the stop, the claimant also challenges the scope of the stop, specifically, questioning Mr. Diop and Mr. Konate on matters unrelated to the reason for the stop. However, the initial questions related to the driver's and passenger's identities and their purpose for traveling are not beyond the permissible scope. See Palomino, 100 F.3d at 449; United States v. Hill, 195 F.3d 258, 268 (6th Cir. 1999). Without more, the scope of the stop would be limited to those areas. However, having credited Officer Campbell's testimony about smelling marijuana, it was reasonable to continue questioning about drugs, guns, or money in the van.

Although the claimant describes the stop as lasting "roughly six hours," Docket Entry No. 17, at 10, the period between the initial stop and the discovery of a large amount of cash is really the critical time period at issue. That time period was approximately 34 minutes.

The time spent conducting the search resulted, in part, from the fact that the van was full of artwork and only when the officers diverted the search from the artwork to the front of the van did they discover the suitcase in the front of the van. The time at issue is really the time before Mr. Diop executed the consent to search form since, as addressed below, the Court finds that Mr. Diop's

---

[24] The claimant claims that the money totalled $285,000.00, whereas the plaintiff contends that the money totalled $275,000.00. That issue is not, however, relevant to the motion to suppress.

[25] It is not clear to the Court why the Government contends that Mr. Konate's act of writing down the amount is somehow suspicious.

consent to search was voluntarily made. Once a significant amount of cash was discovered, the officers clearly had reasonable suspicion to prolong the stop and the search further.

At approximately 1:10 p.m., Officers Hawn and Utley arrived on the scene with their drug detection dogs, and, within a few minutes, Officer Hawn began leading his dog around the perimeter of the van. The time between the discovery of the cash and Mr. Konate's acknowledgement of a large sum of money and the beginning of the inspection by the dogs was not unreasonable. Once the dogs alerted to the odor of drugs both at the outside of the van and at the suitcase in the van, there was an additional basis for prolonging the stop. At approximately 2:30 p.m., Mr. Konate was driven in Officer Campbell's car and Mr. Diop drove the van to the nearest exit so that the cars would no longer be on the side of the highway.

The video was turned off shortly after everyone assembled at the Citgo Station, and there was little testimony about exactly what transpired thereafter. Agent Riddle's testimony did not provide a minute by minute chronology of every event and conversation at the Citgo station, but he did testify that he and others talked to Mr. Konate and Mr. Diop and presumably a thorough search of the van was conducted since the van was released to Mr. Diop later in the afternoon after dark.

However, it is not the period of time at the Citgo station about which Mr. Konate appears to complain but rather the time prior thereto. The Court finds that, under all the circumstances outlined above, the duration of the stop was not unreasonable.


3.    Search of the Van[26]

Mr. Diop has been in the United States almost 20 years, he is a United States citizen, and he has transacted business in this country. There was no proof that he was unable to read or understand English. In fact, his testimony confirmed that he could both understand and speak English. Although Mr. Diop may have initially occasionally misunderstood questions asked during the

_____

[26] Although the claimant has not expressly challenged the validity of Mr. Diop's consent to search the van, the Court has addressed the issue as a preliminary matter in light of the testimony at the hearing.

19

hearing, his miscomprehension was not significantly greater than other witnesses in court proceedings. Even though Officer Campbell acknowledged that he did not verbally advise Mr. Diop that he had a right to refuse to consent to the search, the form itself provided that information.

The Court finds that Officer Campbell at all times acted politely and professionally toward Mr. Diop and Mr. Konate. Mr. Diop testified that he was offended because Officer Campbell had honked his horn at him while Mr. Diop was standing outside the van. Even if his honking the horn was not the epitome of politeness, in all other respects, Officer Campbell was respectful and non-threatening. By his testimony, Mr. Diop at least inferred that Officer Campbell and/or Officer Currie had treated the African artwork with disregard and had been responsible for breaking certain pieces. However, nothing in the video tape showed that the officers were careless in their inspection and removal of any of the artwork in the van. In fact, Officer Campbell maintained his professionalism even when addressing other law enforcement personnel at the scene and on the telephone. Although Officer Campbell clearly had doubts about the explanations given him, he was never rude, threatening, condescending, or bullying. The Court finds that Mr. Diop's consent to search the van was voluntarily made.

However, the claimant argues that, even if Mr. Diop had provided a voluntary consent, Mr. Konate retained a proprietary interest in the contents of the van and thus has standing to contest the search of the van. He bases that proposition on Mr. Konate's statement that there was African art in the van and that, by such statement, Mr. Konate "implicitly asserted" an ownership interest in the African art. Docket Entry No. 17, at 12-13. Thus, although the consent-to-search form includes consent to search "luggage, containers and contents of all," the claimant maintains that the search does not extend to the portion of the contents of the van in which Mr. Konate, rather than Mr. Diop, had an ownership interest and thus a legitimate expectation of privacy in his possessions in the van.[27]

---

[27] Although the government challenges Mr. Konate's standing, the claimant points out that the issue of what had in the past been considered "standing" is more a question of expectation of privacy in Fourth Amendment cases. See United States v. Smith, 263 F.3d 571, 581-82 (6th Cir. 2001).

The Court cannot make the leap the claimant seeks. Mr. Konate's statement that the van contained African art does not implicitly or otherwise suggest that he was the owner of the art. Although Mr. Konate later provided Officer Campbell with more information about the ownership of the African art, Officer Campbell did not know at the initiation of the search that some of the artwork belonged to Mr. Konate. His statement that the van contained African art does not implicitly or otherwise suggest that he is the owner of the art.

Even without the consent of the owner of the van, the Court finds that there was probable cause to search the van. Probable cause was established by Officer Campbell's reasonable belief that he smelled marijuana, coupled with Mr. Diop's reaction to questions about money in the van.

The parties do not delineate between the two searches, one before the dog detection and one thereafter. However, the Court finds that there was probable cause to search the van both before and after the dog detection.

It is the government's position that, under the authority of United States v. Ross, 456 U.S. 798, 823, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), because there was probable cause to believe that the van contained marijuana, law enforcement has a right to conduct a warrantless vehicle search even if a passenger has a legitimate expectation of privacy. The claimant does not address the applicability of Ross, and instead cites cases from circuits other than the Sixth Circuit. The Court agrees with the government that those cases are not controlling and are factually distinguishable from the circumstances in this case. For instance, the claimant suggests that Officer Campbell's testimony that he smelled marijuana, if found to be credible, would nonetheless be "nullified" by the fact that no marijuana was found in the van. Docket Entry No. 19, at 17. citing United States v. Nielsen, 9 F.3d 1487, 1491 (10th Cir. 1993). The Court questions whether Nielsen espoused such a rule, but, in any event, the claimant has not provided any cases indicating that the Sixth Circuit has adopted such a rule.

The Court finds that, under the controlling authority of Ross, Officer Campbell and Officer Currie had probable cause to search the van that included items in which Mr. Konate had an

21

ownership interest even if Mr. Konate would have otherwise had a legitimate expectation of privacy in the contents of the van.

4.    Search of the Suitcase

In the midst of the search of the van, the suitcase was located in plain view in the front of the van between the driver's and passenger's seats. It contained two combination locks, one of which was open, and the other of which required a combination number. Officer Campbell called out "What's the combination?" Mr. Konate responded, "000." Prior to that time, neither Mr. Diop nor Mr. Konate had claimed an ownership interest in the suitcase, nor had Officer Campbell or Officer Currie inquired about the owner of the suitcase.

The claimant argues that, even if Mr. Konate did not have a legitimate expectation of privacy in the contents of the van in general, he had a legitimate expectation of privacy in his locked suitcase. Again, the government cites United States v. Ross, supra, and the claimant does not address Ross.

In Ross, the United States Supreme Court held:

[A]n individual's expectation of privacy in a vehicle and its contents may not survive if probable cause is given to believe that the vehicle is transporting contraband. . . [Privacy] interests must yield to the authority of a search . . . .

***

The scope of a warrantless search of an automobile thus is not defined by the nature of the container in which the contraband is secreted. Rather, it is defined by the object of the search and the places in which there is probable cause to believe that it may be found. . . .

456 U.S. at 823-824.

Although lower courts have declined to extend the rationale of Ross and have distinguished it factually based on the particular context, it appears to the Court that Ross remains controlling authority. Again, the claimant does not address the applicability of Ross and cites cases from other circuits, all of which the government distinguishes on their facts. Even without considering whether Mr. Konate implicitly provided consent to search the suitcase when he responded with the

22

combination number, the Court again finds that there was probable cause to search the van and that, pursuant to the holding in Ross, Officers Campbell and Currie had the authority to conduct the initial search of the locked suitcase located in plain view in the front of the van.

## C.  CONCLUSION

For the reasons addressed above, it is recommended that the claimant's motion to suppress (Docket Entry No. 16) be DENIED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this notice, and must state with particularity the specific portions of this Report & Recommendation to which objection is made.  Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,


JULIET GRIFFIN
United States Magistrate Judge

23